Kalini? Yes, Your Honor. Did I get close on that one? You got it exactly right. All right. Thank you. May it please the Court, I'm Steve Kalini for Petitioner Siddiqui Bamaba and with the Court's permission I'd like to reserve three minutes for rebuttal. That will be grand. Thank you, Your Honor. I think it's important here because of the standards at play to review briefly the facts in this case. My client, Petitioner Siddiqui Bamaba, is a young man who left Guinea. He left his home and fled Guinea to save his life after he was persecuted because of his membership in the rally for the people of Guinea and his affiliation with other RPG members, namely his parents and his employer. Specifically, the evidence shows that on February 14, 2007, Mr. Bamaba was attacked by a band of repressive, politically motivated soldiers who were running through the streets of the capital in an effort to continue to impose martial law and weed out opponents of the government, such as Mr. Bamaba and his parents of the RPG. Mr. Bamaba was confronted while he was guarding the home of his employer, who was a prominent RPG member, brutally beaten with a baseball bat and savagely kicked in the groin, leaving him, as the objective medical evidence in the record shows, with a permanent injury to his testicles. He's also scarred. He's scarred also by the fact that what happened after he was able to flee from the band of soldiers to his parents. Mr. Kalani, I think we pretty much, we're very familiar with the facts here. We're very familiar with the facts. Yes, Your Honor. I think, though, that in setting the stage, I was about to say that his parents were, in fact, killed that in effect, the death certificates actually prove that both of Mr. Bamaba's parents were killed and died on two days later, on February 16, 2000. They don't necessarily prove they were killed, they prove they died. Well, they do prove they died, but his mother's death certificate, two days after the, or a day and a half after the event occurred, shows that she bled to death from her gunshot wound. It doesn't say that, but it said that she died of fibrin bleeding. Now, even the administrative judge, Tadal, here, said, acknowledged, that it was quite possible that the cause of the death was this attack that Petitioner was forced to witness along with his wife and to undermine Mr. Bamaba's credibility rather than to corroborate the terror rained down upon his family by the Condé's government soldiers on that night. And this court held in the Singh case, and Judge Cowen was on that panel, that the BIA cannot make credibility determinations without first weighing the purportedly damaging evidence against the persecution the asylum applicant claims to have suffered. And that's why I bring up and dwell on even the death certificates, because they're powerful corroborating evidence of Mr. Bamaba's claims. How about the situation that it seems that he was leaving, he had intentions of leaving because he had, some time prior to the incident which he alleges were his motivation for leaving the country. Well, Your Honor, I believe you're referring to the printout that the government put into evidence. And the BIA's focus on that was merely to say that Mr. Bamaba waived any challenge to the immigration judge's use of the printouts because he failed to object to the admission of the printouts at the asylum hearing. But the government overstates what those printouts can show. They say that the DHS reported that it received the application for the travel document bearing Mr. Bamaba's photograph on November 25, 2006. However, the DHS didn't produce a copy of any such reported application. It didn't report receiving the application through an affidavit or oral testimony. All that they did was to submit a printout, apparently from an online database, that purported to display information associated with the travel document Mr. Bamaba used to enter the United States. And none of the biographical information on the printout, and you can look at it in the record at page 278, it has a different name, birth date, and country of origin. None of those are Mr. Bamaba's. The only connection to it is his photograph. And so when the government... Well, wouldn't that stand to figure, though? I mean, we get a lot of these cases. Isn't that what they wouldn't put all of his actual information on there, would they? Well, we just don't know, Your Honor. There was no evidence to support any inference that that was more than just his picture. We all know, having dealt with databases in our lives, that they're fraught with error. And here, the government could have easily put on evidence to try and document this. In fact, even the immigration judge here stated when she admitted the document into evidence that, I'll proceed in entering these documents, and of course there will always be a question as to what the provative, and she didn't use the word value is, but it's obvious that's what she meant, of any of these documents will be afforded. So that's precisely the point. Well, the point is that the IJ, though, is permitted to make inferences which are reasonable. And why would it be unreasonable for the IJ to make an inference which is contrary to the interest of your client as to when he decided he was going to take off? I would say that it's not reasonable in the face of all of the testimony. And here, the testimony supported every aspect of the claim that my petitioner made.  Correct. The testimony and the application and the objective evidence as well. The objective evidence, excuse me. There was one thing I was interested in. Whatever happened to the man's wife and children? They didn't offer any affidavit or anything verifying or corroborating in any way any of the allegations that he himself is setting forth. Is his wife and children still around or what? Well, Your Honor, unfortunately, they are still back in Guinea, as far as he knows, in Conakry. He had to flee to save his life. He never mentioned anything about them at all? Well, the record does mention, in fact, that they were forced to watch the massacre of his parents and the brutalization of himself while he was held on the floor. But then there was never any affidavit or any proof that they offered by way of any type of even a letter or anything verifying what his recount of what the incidents he claims forced him to leave the country. That's true, Your Honor, but the other objective evidence in the record, for example, the membership that he held in the RPG, the medical evidence and the other documents from his employer do substantiate all of his testimony. And so in the face of that, and again, his testimony, when you look at it in the record on the point as to why his photograph was associated with the travel document in the database, was that he had no idea. And he said the first time that he was asked, I believe it was on cross, and he said the first time that I ever submitted a photograph for a passport was on March the 25th or March the 26th, excuse me, February 25th or 26th. And that was after he had escaped from jail after being there for a week and having been beaten and was able to go to the home of his family, of his father's best friend, who was able to secure documents and get him out of the country. And I think it bears noting that Your Honor has in fact noted that when people flee the country, and I'm talking about the Lee-Wu Lin case that we cite in our brief, and you observed, Your Honor, that political refugees are rarely able amid the confusion of flight to amass physical evidence verifying the validity of their asylum claims. Yeah, but surely you should be able to get an affidavit from his wife who witnessed the events  And that's a matter of lack of evidence, especially when the IJ here in effect said that he lacked credibility. And to reverse that, we have to say that we have to be compelled to an opposite conclusion. But the BIA never even analyzed that. All they said was that this was a waiver. So in order for Your Honors to find that there was substantial evidence in the record, you would essentially have to go back and do the job that the BIA should have done, which is one of the reasons we're suggesting that remand is appropriate. There wasn't a waiver here. All there was was consent to the admissibility of the document. So I don't think that that is a waiver, and I think the law is clear on that. Did you move to your cat claim? I was interested in that. I know you don't have a whole lot of time left. Sure. I do have some rebuttal time, but I'm happy to, Your Honor. Well, I see it looks as though it was denied because of the adverse credibility determination. Maybe you could deal with the cat claim. Sure. That is the fact. The government was, in fact, supposed to conduct a separate inquiry. Excuse me. The BIA was supposed to conduct a separate inquiry. And instead, what they did was, based solely on the adverse credibility determination, denied Mr. Bamaba relief under the convention and said that he was not entitled to cat protection. And as a matter of fact, the only thing that they're supposed to do is to determine, this is the determination under the cat, that whether or not there was any danger that the country, whether there's a likelihood that if he were returned to Guinea, that would be a place where it's likely he or she would be tortured. Well, as the record stands now, we're talking about the situation as it was when the brief, when the case was argued to the BIA in 2007. And there you can see that it's uncontroverted that the situation in Guinea remained just pretty much the way it was when this court decided the Diak case. And we've cited that and quoted it in our brief. That is to say that it remained, and I will say that it remains to this date, just a mess as far as human rights violations are concerned. I didn't really get to touch on the first aspect of the argument, and that is the picture, but I can do that on rebuttal if it's necessary. You can do that on rebuttal. That's why I was trying to direct you away from some of the facts to get to the substance. Thank you, Your Honor. Okay. Mr. Mencken? Good morning, Your Honors. May it please the Court. Jeffrey L. Mencken, U.S. Department of Justice for the Attorney General. Your Honor, as the Court pointed out, Mr. Bamaba was found incredible, and the issue is whether there is evidence that would compel the finding that he was actually credible, and I don't think this record supports any such an inference. I'd be happy to entertain questions from the Court, but I would just point out that a number of problems with the presentation before was that I don't think there's any concession that Mr. Bamaba's parents were even dead, let alone murdered, the night of this particular alleged incident. The death certificates, such as the so-called, don't support that, as the Board and the IJ pointed out. In fact, one says that the father was hospitalized a full month before this incident. The other one says that the mother was allegedly hospitalized two days before the incident. So I wouldn't concede that there's anything concerning a death at all. One important thing about the photograph, and I invite the Court to look at appendix page 347 and page 278. One is the travel document that Mr. Bamaba admits was fraudulent, and the other is the DHS record. They both have the same photograph. So if this is a photograph that he says wasn't taken until the end of February, weeks after this incident, how does DHS come into possession of it in November of the preceding year? That's never been answered. And to say that that document is admitted but it should be given no weight, I don't think weight in an administrative proceeding is a discretionary determination. Is it clear that the document that DHS had in November was a document that had his photograph on it in November? If we look at it, Your Honor, there's no contrary evidence. If you look at the document, 278, it has his photograph on it. It's the same photograph that he identified as being his photograph that appears on the travel document. So there's a couple of problems. One is Mr. Bamama says that the travel document that has a fake name on it was altered. There's no other evidence of that. Secondly, are we to assume that the DHS document was altered? We're just speculating then. If we're coming down to the weight to be given, and it's not just that one document. There's two other documents. There's Exhibit 5 and Exhibit 7, which also say that the application was made in November of 2006. And those are record pages 366 and 347. If we are talking about the weight the administrative body should have given us, when there was no argument that they shouldn't be given any weight at all, there's no argument, that's a discretionary function. And I don't think under the Real ID Act that this Court even has jurisdiction to get into the discretionary question of weight. And that's really what we're dealing with. It's admissible, but it should be given no weight based on an argument I didn't make below. I don't think so. But even so, we don't get there. Judge Cowen pointed out something, that there's nothing to show that the no evidence from the wife. Mr. Bamama was able to get evidence from Guinea after he left. He got these death certificates. Why is there nothing from the wife? Why is there nothing saying that the wife is even missing? His employer who lived down the street, who was supposedly, according to counsel, a prominent member of the RPG, why couldn't he? He submitted something which never talks about this incident. He just says that Mr. Bamama worked for him. And if he's a prominent target of the RPG, and was the target of the search that night, why was he never harmed? There's just holes in this thing that you can drive a truck through. And that means that the burden on Mr. Bamama here to show that the record compels the finding of credibility cannot be met and has not been met. Unless there are other questions. Did you mention the cat claim? Yes, I was about to get to that, Your Honor. I think what we have here is the cat claim is based on the same alleged facts. And if the facts that he alleges are found to be incredible, then... But isn't the problem that the BIA just relied on the credibility determination? I mean, isn't that a problem according to our law? I don't think so, Your Honor, because the claim is based on the one single incident. And he doesn't become credible on that allegation merely because he's filed a cat claim. If the incident that is the basis of his cat claim is found not to have happened, then where is his cat claim? But don't cat claims look to the future? I mean, isn't it a different analysis? Well, yes, and we can go to that future and look at what is there. There was one objective report in the record. There was a country report from 2006, and that's all. But aren't we reviewing the BIA's decision, though, where they didn't even deal with that? I don't believe that there's an obligation on the Board to address every piece of evidence. But what we don't have here is a showing that there is evidence, that there was evidence in the record that compels a finding that he was entitled, that he was more likely than not to be tortured, especially when there's no showing that he is specifically likely. It's not a great country. I wouldn't move there. But that's not to say that I get torture protection and I get to stay here. There's nothing showing that he as a member of the RPG is more likely than not to be targeted for torture. There are members of the RPG who haven't been tortured. His boss wasn't tortured. There's no evidence of that. And he was a prominent member of the RPG. But again, you're pointing to the record, and that's a responsible thing to do, except that we're reviewing the BIA's decision at this juncture, right? And all they said about the cat claim was he's not credible, therefore he can't succeed on his path. The last claim of torture is not credible. That's reading between the lines. I mean, are we able to go to the IJ's decision and look and see how the IJ dealt with that? Well, I would submit that even though it's not specifically discussed, the record was before the board, and there was a reasoned analysis as this is a fairly thorough board decision as they go. The question is what is in the record that would compel a finding that he was more likely than not to be tortured, and there's nothing there. There's a great reliance on materials that are not in the record, and that are other reports, the Human Rights Watch thing and that sort of thing. The universe, the publicly available universe is not the record. If that was true, then I could point out that the president that everybody was afraid of died last year. You know, if we're going there, well, let's go there, but we don't need to. I would submit that the burden here is not on the government to prove anything. It's on Mr. Bhamaba to point out where in the record he's entitled to relief. He failed below, and he's failed here. What about Sabita versus Ashcroft? Didn't that pretty clearly say that credibility determinations for asylum and withholding and removal do not defeat one's ability to meet the burden under the Convention against Torture? Well, I don't think that that's my reading of the board's evidence or finding, rather, is that the allegation is the same. The facts are the same, and those allegations don't become credible merely because we're now looking at it in the context of a CAT claim. If what he says is the basis for his claim that he's going to be tortured didn't happen, then the board may have cited it in shorthand, but I don't think that we have to now presume he is credible, and everything that we say didn't happen now happened. Would you agree that in looking at the IJ's decision that she was particularly concerned about the travel documents and the fact that he had applied in November of the year before? I think that was... That was the principal basis for her credibility determination. Would you agree with that? There were two aspects to the credibility determination. That certainly was one of them. Would you agree with that? That's what she stated first. It seems like she focused most on... Yes. Wasn't the photograph that was found in the home with the opposition party leader, wasn't that a relatively insignificant issue? It was secondary. I think the concern that the IJ identified was that that provided the trigger. The fact that Mr. Bamaba put in his asylum application that his parents were members of this party doesn't mean anything if it wasn't what triggered the attack. He admitted that they didn't go to this house looking for his parents, or they went to this house because they followed him as he ran away. But isn't it easy for a person to overlook a photograph when they're compiling an application or even when they're amending an application? My point is, does it mean all that much? Not particularly. I think on the fraudulent claim that this travel document was prepared after the event, I think that alone sinks him. It's not an all-or-nothing proposition. You'll agree that this is a post-real ID Act case, and we need to look at the totality of the circumstances. Very much so, Your Honor. And even though the travel document problem doesn't go to the heart of his claim, or it does go to the heart of his claim, it doesn't need to go to the heart of his claim. That's what I meant to say, and that I think we said in our brief. The second issue. Now, you claim that there – you argue that there was not an objection made to the admissibility of those travel documents. There was none, Your Honor. There was none. There was no objection. But can't the petitioner here properly argue that the inferences that the IJ made from those documents was improper based on the documents themselves? I don't think so, Your Honor. We're talking about an administrative proceeding, so the rules of evidence, first of all, don't apply. Secondly, the judge specifically asked if there was an objection, and the answer by counsel was no. Okay. There's no discussion. What does that mean? Okay. You're not objecting to the documents being offered. Right. But certainly, as before the BIA in here, certainly it was objecting to the IJ and then the BIA concluding from the existence of those documents that his whole story was uncredible. I'd go a step further. Isn't that a legitimate argument? No, Your Honor. And I'd like to add something to the objection part, and that is that these documents, the weight to be given to these documents was not included. It's never mentioned in counsel's closing argument to the IJ. And it is mentioned in the DHS counsel's closing argument. But if we're getting down to the inferences, that is why we have administrative judges and we have administrative review boards. That's a discretionary function. And I think it's very clear under the Real ID Act that we're not supposed to be getting into that. That is a purely discretionary function, how it should be looked at. You can't say, yeah, it's admissible, but you can't look at it. This is an administrative proceeding. But they don't have to agree with you with the inference that the IJ drew from those documents, even though they weren't objected to. I wouldn't expect Mr. Bamaba to agree with the inference. That's why we're here. But the board agreed with the immigration judge, and the board's decision is what's before us. To come in here now and say he shouldn't have weighted, or the board shouldn't have weighted that way, it should have been weighted a different way. I don't think, first of all, we ever get there. The Real ID Act really precludes the court from looking at that discretionary function. But the deciding issue is what the record, whether the record compels a finding of Where is Mr. Bamaba now? As far as I understand, and counsel has more information, I believe he's confined. I don't know exactly where. There's no stay granted here. Well, he can answer that. I don't believe there was a stay granted. I don't know what plans DHS has right now. Unless there are further questions, I'd be happy to, which I would address. I will rest on the pleadings. Thank you very much. Thank you. Thank you. Mr. Mankin? Mr. Collini? Where is Mr. Bamaba? We succeeded in getting Mr. Bamaba paroled. You're right that there is no stay in place, but he is on parole. I think, Your Honor, I wanted to just start out by saying that the government takes the position that it's sufficient if it makes a showing on only one thing. And the REAL-ID Act has not displaced the substantial evidence standard. That's just not the fact. So they, in order to succeed here, the government actually has to succeed on both of these findings, because their findings, that is the BIA's findings, was pinned on the one waiver point that we've discussed and also on the failure to mention the photograph, which, as we've set out, is really an ancillary fact. It doesn't go to the main part. Stop at the waiver point. You're arguing here that the documents were not reliable and trustworthy. That is correct, Your Honor. Isn't that what an objection to admissibility goes to, the reliability and trustworthiness of a document? It can here, but, Your Honor, I would refer you to the decisions of the court, and particularly, again, Judge Cowan's opinion in the Li-Wen Yu case, excuse me, Li-Wu Lin case, where he said that the BIA cannot hide behind and rely on government submissions simply because they appear on official letterhead. To assess reliability and trustworthiness, an immigration judge must inquire who actually authored or approved the government submissions, what the scope of those individual duties had been, how they obtained the information communicated, and whether their sources were reliable. So to take the absolutely harshest conclusion simply based on the fact that there was no objection to admissibility, and that's all that was done by the BIA here. They never analyzed whether, in fact, it showed what the government says it showed. And I also wanted to make the point that I believe that my adversary misspoke when he said that the board had considered the death certificates. They steered clear of those death certificates. Why? Because they knew that anybody who looked at the death certificates issued two days after the massacre on Valentine's Day, if you'll pardon the allusion, just belies that there was any doubt that my client actually did show that he is entitled to asylum. And as to him having opened the door as to what's going on in Guinea right now because of the supposed death of the dictator that everybody was afraid of, well, I looked at the 2008 country report for Guinea that was released in February of this year, and it makes it clear that Mr. Bhamaba would be even in greater jeopardy now. Guinea's constant – That's not in the record, right? It isn't in the record, Your Honor. Nor is the death of the dictator. We overlooked that. All right. But the situation in Guinea is abysmal. I'll give my call as a cautionary instruction not to paint it. All right. Well, then I best stop speaking on that point. But unless Your Honors have any further questions, I thank you for indulging me. Thank you very much. And thank both counsels for their arguments, and we'll take the matter under advice.